UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                    CASE NO: 3:14-cr-35-J-32JBT

TIMOTHY LARRY MALDEN

_____/

## REPORT AND RECOMMENDATION[1]

**THIS CAUSE** is before the Court on Defendant's Motion to Suppress Statements (Doc. 58) ("Motion") and the United States' Response in opposition thereto (Doc. 74) ("Response").   The undersigned held an evidentiary hearing on September 10, 2014.  (Transcript ("Tr.") at Doc. 84.)   For the reasons given below, the undersigned respectfully **RECOMMENDS** that the Motion be **DENIED**.

### I.    Issues Presented and Summary of Recommendation

On January 24, 2014, Timothy Larry Malden ("Defendant") drove himself to the United States Secret Service Jacksonville field office where he was interviewed by Secret Service Special Agent ("S.A.") Andrews and S.A. Lomonaco.  This was Defendant's second interview at the Jacksonville field office.  The first interview, which was conducted by S.A. Lomonaco alone, took place on January 6, 2014.

On February 27, 2014, in the second count of a two-count indictment,

---

[1] Within fourteen days of service of this document, specific written objections may be filed in accordance with 28 U.S.C. § 636, Rule 59, Federal Rules of Criminal Procedure, and Rule 6.02(a), Local Rules, United States District Court, Middle District of Florida. Failure to file a timely objection waives a party's right to review.  Fed. R. Crim. P. 59.

Defendant, along with two co-defendants, was indicted for passing, uttering, and publishing, and attempting to pass, utter, and publish, Federal Reserve Notes with intent to defraud, in violation of 18 U.S.C. § 472 and 18 U.S.C. § 2.  (Doc. 1 at 2.)  One of the co-defendants, Christopher Kirkland, was also charged in Count One with making counterfeit Federal Reserve Notes.  (*Id.* at 1.)

In the Motion, Defendant claims that the oral and written statements he made on January 24, 2014 should be suppressed for three related reasons.  First, the statements were obtained in violation of his privilege against self-incrimination guaranteed by the Fifth and Fourteenth Amendments.  Second, the statements were obtained in violation of his right to counsel guaranteed by the Sixth and Fourteenth Amendments.[2]  Finally, the statements were a result of continued and persistent questioning under circumstances indicating intimidation or inequality between interrogators and Defendant, and thus the statements were not freely and voluntarily given, in violation of the Fifth and Fourteenth Amendments.  (Doc. 58.)

The resolution of all three arguments depends largely, if not entirely, on a determination of the credibility of the witnesses.  Specifically, the agents' version of the events was starkly different from Defendant's version, and that of his witness.  For the reasons discussed herein, the undersigned finds the agents' testimony significantly more credible than the testimony of Defendant and his witness.

---

[2] Both Defendant's privilege-against-self-incrimination argument and his right-to-counsel argument rely on *Miranda v. Arizona*, 384 U.S. 436 (1966).  (*See* Doc. 58.)  Thus, the undersigned addresses these arguments together.

Accordingly, the undersigned proposes that the Court generally adopt the agents' testimony as its findings of fact, and recommends that the Motion be denied.

## II.    Standard

*Miranda v. Arizona* holds that, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. **"**Before a suspect's uncounseled incriminating statements made during custodial interrogation may be admitted, the prosecution must show 'that the suspect made a voluntary, knowing and intelligent waiver of his privilege against self-incrimination and his right to counsel.'" *United States v. Lall*, 607 F.3d 1277, 1282 (11th Cir. 2010) (quoting *United States v. Beale*, 921 F.2d 1412, 1434 (11th Cir. 1991)). If a defendant "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." *Miranda*, 384 U.S. at 444–45.

"The 'initial step' in determining whether a person was in 'custody' under *Miranda* 'is to ascertain whether, in light of the objective circumstances of the interrogation' and the totality of all the circumstances, 'a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave.'" *United States v. Matcovich*, 522 F. App'x 850, 851 (11th Cir. 2013) (per curiam)

(quoting *Howes v. Fields*, 132 S. Ct. 1181, 1189 (2012)).[3]

> One of the factors a court should consider when determining whether the defendant was in custody is the location of questioning. . . . Courts may also consider whether a defendant was unambiguously advised that he is free to leave and is not in custody.  This is a powerful factor that generally will lead to the conclusion that the defendant is not in custody absent a finding of restraints that are so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview.  Other relevant factors include whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled, as well as the duration of the questioning, statements made during the interview, the presence of physical restraints during questioning, and the release of the interviewee at the end of the questioning.

*Id.* (internal citations, quotation marks, and alterations omitted).

Regardless of whether a defendant is in custody for *Miranda* purposes, a confession must be free and voluntary in order to be admissible.  *See Lall*, 607 F.3d at 1285 ("Even if Lall was not in custody in the technical sense (and thus *Miranda* Warnings were not required), we would still be required to address the voluntariness of his confession.").  The government must prove "by a preponderance of the evidence, that a challenged confession was voluntary."  *Id.* (citing *Lego v. Twomey*,

---

[3] As the Supreme Court recently held, "[n]ot all restraints on freedom of movement amount to custody for purposes of Miranda."  *Howes,* 132 S. Ct. at 1189.  The Court also considers "the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."  *Id.* at 1190.  As the undersigned does not find that there was a restraint on the freedom of Defendant's movement, the undersigned does not address this second step.

4

404 U.S. 477, 489 (1972)).  In conducting the voluntariness inquiry, courts consider the following:

> The Fifth Amendment prohibits the use of an involuntary confession against a defendant in a criminal trial. We focus our voluntariness inquiry on whether the defendant was coerced by the government into making the statement: The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. The district court must consider the totality of the circumstances in assessing whether police conduct was causally related to the confession. Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession.  Government coercion is a necessary predicate to a finding of involuntariness under the Fifth Amendment. Absent police conduct causally related to the confession, there is . . . no basis for concluding that any state actor has deprived a criminal defendant of due process of law.

*United States v. Thompson*, 422 F.3d 1285, 1295–96 (11th Cir. 2005) (internal citations and quotation marks omitted).

## III.    Evidence at the Hearing

The government called S.A. Andrews and S.A. Lomonaco to the stand. Defendant testified and called Mr. Kareem Brumfield to the stand.  The government admitted as its only exhibit Defendant's written statement from the January 24, 2014 interview (Doc. 86-3).  Defendant admitted as his only exhibit a portion of his cell phone bill showing calls to and from Defendant's phone on January 24, 2014 (Doc. 86-4).

### A.     Testimony of S.A. Peter Andrews and S.A. Lawrence Lomonaco

To the extent the testimony of the two agents overlaps, their testimony will not be discussed separately.  The Secret Service first contacted Defendant on January 6, 2014.  (Tr. 45–46.)[4]  S.A. Lomonaco called Defendant and told him he was conducting a counterfeit currency investigation and wanted to meet with Defendant to discuss matters relevant to the investigation.  (Tr. 46.)  Defendant came to the Secret Service Jacksonville field office that day, and S.A. Lomonaco interviewed him.  (Tr. 46.)

At this first interview, S.A. Lomonaco asked Defendant to either turn his phone off or turn the volume up and put it another room if he was expecting a phone call. (Tr. 47.)  Defendant did not object to this.  (Tr. 47.)  During the interview, Defendant told S.A. Lomonaco that he had loaned his truck to Mr. Kirkland and that he had no knowledge of what Mr. Kirkland was doing or if he was passing counterfeit currency. (Tr. 70.)  Later, within the same interview, Defendant told S.A. Lomonaco that he had lied to him and had actually driven Mr. Kirkland around to various stores.  (Tr. 70.)  Defendant was boisterous during this interview and at times raised his voice. (Tr. 72.)

S.A. Lomonaco next contacted Defendant by phone on January 24, 2014.  (Tr. 47.)  He told Defendant there were inconsistencies in some of the statements

---

[4] All citations to the transcript refer to the header page number as supplied by CM/ECF, as opposed to the pagination on the transcript itself.

Defendant had made during the January 6 interview.  (Tr. 48.)  S.A. Lomonaco asked Defendant to return to the Secret Service office to speak with him.  (Tr. 48.) Defendant agreed to come that day and set a time for the meeting.  (Tr. 48–49.) Defendant was cooperative during the phone call and seemed to indicate he had expected to hear from S.A. Lomonaco and wanted to speak with him as soon as possible.  (Tr. 48.)  He did not mention anything about an attorney during the phone call.  (Tr. 49.) Defendant presumably drove himself to the Secret Service office.  (Tr. 49.)

On that day, S.A. Andrews and S.A. Lomonaco were dressed in plain clothes. (Tr. 11, 49.)  S.A. Lomonaco was not carrying a firearm.  (Tr. 50.)  S.A. Andrews did not specifically recall if he was carrying a firearm that day, but he likely was.  (Tr. 11.) However, when he does carry a firearm, it is covered at all times by his polo shirt. (Tr. 11.)  S.A. Andrews' badge was also covered by his shirt.  (Tr. 39.)  Neither S.A. Andrews nor S.A. Lomonaco was carrying any other tactical gear that day.  (Tr. 11, 50.)

At the office, S.A. Andrews asked Defendant if he could pat him down for weapons. (Tr. 10.)  Defendant consented and remained calm.  (Tr. 10.)  Defendant seemed familiar with the Secret Service field office.  (Tr. 50.)  Defendant entered the interview room and took a seat.  (Tr. 11.)  The interview room was the same one in which the January 6 interview took place.  (Tr. 50.)  Neither S.A. Lomonaco nor S.A. Andrews directed Defendant to sit in a particular seat or location.  (Tr. 11, 51.)  S.A.

7

Lomonaco sat across from Defendant, and S.A. Andrews sat at the end of the table. (Tr. 12, 51.)  The interview room was approximately nine feet by nine feet.  (Tr. 8.) There was a pair of leg iron shackles attached to a rail on the side of the room.  (Tr. 136–37.) S.A. Andrews closed the door (Tr. 12), automatically locking it.  (*See* Tr. 9.)  When the door automatically locks upon being closed, there is no overt indication that it is locked.  (Tr. 9, 21–22, 51.)

S.A. Lomonaco told Defendant he was free to go at any time and that he would not be arrested that day.  (Tr. 29, 52–53.)  S.A. Lomonaco also advised Defendant that the information gathered during the interview would be presented to the United States Attorney's Office ("USAO") for further review.  (Tr. 12–13, 52–53.) At no point did S.A. Andrews or S.A. Lomonaco tell Defendant that he would receive immunity of any kind for coming to the Secret Service office and talking to the agents.  (Tr. 13, 53.) There was no discussion of Defendant wearing a recording device of any kind.  (Tr. 66.)  S.A. Lomonaco again asked Defendant to either turn his cell phone off or turn the volume on the phone up and put it in another room if he was expecting any emergency phone calls.  (Tr. 13–14, 52.)  Defendant chose to turn his phone off and put it on the table.  (Tr. 14, 52.)  Defendant did not say that he was waiting for a call from an attorney.  (Tr. 14, 53.)

Defendant seemed eager to speak to S.A. Lomonaco.  (Tr. 54.)  He told S.A. Lomonaco: "I'm here to be honest and tell you the truth this time."  (Tr. 54.)  During the interview, Defendant was calm, cooperative, and responsive to the questions

being asked of him.  (Tr. 13.)  The interview lasted approximately 40 to 45 minutes.[5]

(Tr. 14, 54.)  Defendant did not request to use his phone, turn his phone on, or leave

at any point in the interview.  (Tr. 14–15, 53–54.)  The agents perceived Defendant

to be an intelligent individual, who was alert and understood the questions being

asked of him.  (Tr. 16, 52.)

S.A. Andrews did not at any point stand between Defendant and the door.  (Tr.

40.)  At one point during the interview, S.A. Andrews repositioned his chair and

placed it next to Defendant's chair.  (Tr. 15.)  S.A. Andrews wanted clarification from

Defendant about Defendant's activities at an ATM, so he asked Defendant to

demonstrate what he did at the ATM.  (Tr. 15.)  This lasted for about two minutes,

and afterward S.A. Andrews moved his chair back.  (Tr. 15–16.)  S.A. Andrews did

not display or pull out his firearm at any point.  (Tr. 16.)  There was no yelling or

shouting during the interview.  (Tr. 16, 54.)

At the end of the interview, S.A. Lomonaco asked Defendant if he was willing

to write a statement.  (Tr. 17, 55.)   S.A. Lomonaco offered Defendant a chance to

use the restroom or get a drink of water prior to writing the statement.  (Tr. 17, 56.)

Defendant declined.  (Tr. 56.)  Prior to having Defendant write his statement, S.A.

---

[5]  Defendant's cell phone records indicate that Defendant did not make or receive any calls from 10:51 a.m. until 12:33 p.m., a total of one hour and 42 minutes.  (Doc. 86-4 at 3.)  Although not determinative, this record tends to show that the interview may have lasted longer than the 45 minutes estimated.  However, the undersigned recognizes that sometimes witnesses have a difficult time estimating how long events lasted.  Therefore, the undersigned does not find this apparent conflict to be material to the agents' credibility.

Lomonaco reviewed the written statement form with Defendant. (Tr. 18–19, 56–57.) When reviewing the form with Defendant, S.A. Lomonaco reviewed the *Miranda* warnings on the form and asked Defendant to initial at the appropriate places once he understood the warnings.[6] (Tr. 18–19.) Defendant initialed at the appropriate places. (Tr. 19.) Defendant did not request a lawyer at any point; had he done so, the agents would have ended the interview. (Tr. 26, 67.)

Defendant then provided a written statement and reviewed it with S.A. Lomonaco. (Tr. 19, *see* Doc. 86-3.) Throughout all of this, Defendant remained calm and cooperative, and everyone's tone of voice remained normal. (Tr. 20.) Although the written statement was not consistent with Defendant's oral statements, the agents did not tell Defendant that he could not leave until he cleared up the inconsistencies. (Tr. 38.) S.A. Lomonaco did point out the inconsistencies to Defendant, and Defendant added to the written statement.[7] (Tr. 19–20, 59–60.) At the conclusion of the interview, the agents thanked Defendant for coming to the

---

[6] According to S.A. Andrews, the *Miranda* warnings were reviewed simply because they were printed on the written statement form, not because the agents were conducting a custodial interrogation. (Tr. 25–26.) S.A. Lomonaco was not asked why he reviewed the *Miranda* warnings with Defendant.

[7] S.A. Lomonaco noted that Defendant's handwriting on the statement form is not entirely legible. (Tr. 58.) Over objection, he suggested that Defendant may have intentionally written illegibly, knowing that his statement would be given to the USAO for review. (Tr. 58.) "[A]t a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial." *United States v. Raddatz*, 447 U.S. 667, 679 (1980); *see also United States v. Franklin*, 284 F. App'x 701, 703 (11th Cir. 2008) (quoting *Raddatz* for this proposition). Although the undersigned allowed such testimony to be admitted at the hearing, the undersigned finds it to be speculative and does not consider it in making this recommendation.

office, and S.A. Lomonaco again explained that the statements would be presented to the USAO. (Tr. 20, 61.)

### B. Defendant's Testimony

Defendant testified that he owns a bread distribution center and a property management company. (Tr. 73.) He also invests in properties. (Tr. 74.) He was first interviewed by S.A. Lomonaco on January 6, 2014. (Tr. 102.) The interview was not based on counterfeiting (Tr. 104); instead, S.A. Lomonaco asked more personal questions. (Tr. 103.) S.A. Lomonaco was courteous and professional during this first interview. (Tr. 106.) S.A. Lomonaco did not close the door during the interview. (Tr. 106.) Defendant was allowed to leave at the conclusion of the interview. (Tr. 106.)

On January 24, 2014, Defendant received a phone call from S.A. Lomonaco as he was in his truck driving to Mayport to meet a subcontractor. (Tr. 74–75.) Mr. Brumfield was in the car with Defendant. (Tr. 75.) Defendant was using a hands-free device, so the phone call was broadcast through the speakers of Defendant's truck. (Tr. 75.)

S.A. Lomonaco told Defendant to come to the Secret Service office to answer some questions, because there were inconsistencies in Defendant's previous statements. (Tr. 75–76.) Defendant said he wanted his attorney present. (Tr. 75.) S.A. Lomonaco told Defendant he did not need an attorney, and that he needed to come to the Secret Service office right away or he would be picked up. (Tr. 76.)

Defendant understood this to mean that he would be arrested if he did not make his way to the Secret Service office.  (Tr. 76.)

Defendant hung up the phone and immediately called his attorney, Vic Murray. (Tr. 76.)  Mr. Murray was not available, so Defendant called another attorney, who told him he did not practice criminal law and advised Defendant to call Mr. Murray again. (Tr. 76–77.)  Defendant attempted to call Mr. Murray again, but was not able to reach him.  (Tr. 77, 80.)  Instead, one of Mr. Murray's assistants spoke with Defendant and told him he should not have any contact with the agents without Mr. Murray present.  (Tr. 80, 98.)  Defendant then called his wife, then he called his brother-in-law who is an attorney in Texas, and then he called S.A. Lomonaco.[8]  (Tr. 77.)  S.A. Lomonaco again told Defendant that he needed to get to the Secret Service office quickly.  (Tr. 77.)  Defendant reiterated that he wanted an attorney present, to which S.A. Lomonaco replied that Defendant was not under arrest and he just wanted Defendant to answer some questions.  (Tr. 77.)

On cross-examination, Defendant testified that he did not call any other local criminal defense attorneys because he did not know any and did not have time to look any up. (Tr. 88–90.)  Defendant was worried he would be arrested, as S.A. Lomonaco had threatened, if he did not come to the Secret Service office quickly. (Tr. 90.)  When asked why he did not just drive to Mr. Murray's office, Defendant

---

[8] Defendant testified on cross-examination that S.A. Lomonaco had just testified at the hearing that Defendant called him back that day. (Tr. 97.)  However, S.A. Lomonaco did not testify about a second phone call with Defendant.  (*See* Tr. 47–49.)

said he did not think about it.  (Tr. 98.)  He did not drive to any other criminal defense attorney's office because, again, he did not know any and he did not have time.  (Tr. 100.)

Defendant dropped off Mr. Brumfield and made his way to the Secret Service office.  (Tr. 77.)  S.A. Andrews met Defendant in the lobby and escorted him to the interview room.[9]  (Tr. 81.)  S.A. Andrews directed Defendant where to sit in the interview room, which happened to be the side of the desk to which a set of handcuffs was attached.  (Tr. 81.)  Defendant told S.A. Andrews that he was waiting on a phone call from his attorney.  (Tr. 81.)  On direct examination, Defendant testified that he was instructed to either turn his cell phone off or put it in a room across the hall.  (Tr. 81.)  However, on cross-examination, Defendant testified that he was not given the option to leave the phone across the hall.  He could turn it off or give it to the agents.  (Tr. 108.) The cell phone was turned off.  (Tr. 82.)

Defendant requested to speak with his attorney several times, but the agents told him that if he were to "lawyer up" he would be arrested.  (Tr. 82.)  Defendant also told the agents that he needed to pick up his children from school.  (Tr. 82.) Despite reading the *Miranda* warnings on the written statement form prior to writing his statement, Defendant was under the belief he could not have an attorney, because the agents had told him he needed to answer their questions or he would

---

[9] The agents testified that it was S.A. Lomonaco, not S.A. Andrews, who met Defendant in the lobby.  (*See* Tr. 10, 49.)  The undersigned does not find this conflict to be material.

be arrested.  (Tr. 82–83.)

The tone of the interview was not calm.  (Tr. 83.)  S.A. Andrews banged his hand on the desk a couple of times during the interview, and voices were raised. (Tr. 83.)  S.A. Andrews got less than three inches away from Defendant's face and told him he was lying.  (Tr. 83.)  S.A. Andrews also yelled during the interview.  (Tr. 84.)  Defendant was scared that S.A. Andrews was going to jump on him.[10]  (Tr. 83.) During the interview, Defendant asked to use the restroom but was not allowed to do so.  (Tr. 85.)  Defendant was intimidated.  (Tr. 85.)  He knew the door was locked, because at one point S.A. Andrews left and had to enter a code to leave the room.[11] (Tr. 85.)

Defendant could not leave the interview because S.A. Andrews was blocking the door.  (Tr. 83.)  When he told the agents he wanted to leave, they told him he was not allowed to leave until he gave them a satisfactory statement, even if it took "all day and all night."  (Tr. 83–84.)  Defendant then gave them a written statement, though his handwriting was poor because he was afraid.  (Tr. 84.)   Defendant also explained, on cross-examination, that the part of his written statement in which he says "I will pay back any money Chris Kirkland give to me" (Doc. 86-3 at 3) referred to money he made from roofing work that Mr. Kirkland performed, not any money he

---

[10]  S.A. Andrews is 6'1 and weighs 228 pounds.  (Tr. 27.)  Defendant is 6'1 and weighs about 272 pounds.  (Tr. 86.)

[11] Defendant testified on cross-examination that he knew the door was locked before S.A. Andrews left the room because he saw something red.  (Tr. 117.)

made related to his alleged involvement with the counterfeiting scheme at issue in this case.  (Tr. 113–114.)  When Defendant was leaving the interview room, he walked out of the door sideways instead of turning his back to S.A. Andrews, because he was scared of S.A. Andrews.  (Tr. 110.)

### C.   Kareem Brumfield's Testimony

Mr. Brumfield is a 33-year-old full time student.  (Tr. 123.)  He previously worked with Defendant on a distributorship with Flowers bread company.  (Tr. 123.) On January 24, 2014, Mr. Brumfield was in the car with Defendant job shadowing him. (Tr. 124.) Mr. Brumfield's testimony largely corroborated Defendant's account of his first phone call with S.A. Lomonaco on that day. (*See* Tr. 124–26.)  However, Mr. Brumfield did not remember Defendant calling the agent back while Mr. Brumfield was in the car.  (Tr. 126–27.)  Also, Mr. Brumfield testified that after the phone call, he and Defendant finished meeting with a handyman to drop off some keys, and then Defendant took Mr. Brumfield home.  (Tr. 127.)

### IV.   Analysis

### A.   The Credibility of the Witnesses

In order to recommend a disposition of the Motion, the undersigned must determine which witnesses were credible and which witnesses were not.   The government's version and Defendant's version of the events, as set forth above, are so inconsistent with one another that the stark differences between them cannot be explained just by mere differences in perception of the subject events.  For example,

according to the government's version of the events, S.A. Lomonaco permitted Defendant to choose the time of the January 24, 2014 meeting.  Defendant never mentioned an attorney at any time either before or during the interview.  The tone of the interview was calm and Defendant remained cooperative throughout. Defendant was given a chance to use the restroom and get water.  Defendant was told the interview was voluntary and he was free to leave at any time.  In short, there was little, if anything, about the interview to suggest that Defendant was in custody or was coerced.

In contrast, according to Defendant's version of the events, S.A. Lomonaco insisted that Defendant come in as soon as possible.   The agents ignored Defendant's multiple requests to speak with an attorney both before and during the interview.  The interview was tense; S.A. Andrews lost his temper and was physically intimidating.  Defendant was not allowed to leave the room to use the restroom or get water.  Defendant was not allowed to leave at all until he gave the agents a satisfactory written statement.

Given these differences, the undersigned can conclude only that one side or the other is either intentionally fabricating or misrepresenting facts in that side's favor, or that either Defendant's, Mr. Brumfield's or the agents' perception of the subject events is so far from reality as to make any testimony based thereon not credible.  In order to believe Defendant's and Mr. Brumfield's testimony, the Court would have to disbelieve the testimony of both agents and conclude they were

intentionally misleading the Court.  However, based on the witnesses' demeanor and the content of their testimony, the undersigned concludes that the agents' testimony is largely credible and Defendant's and Mr. Brumfield's testimony is not.  Thus, the undersigned largely accepts the government's version of the events occurring on January 24, 2014, and rejects Defendant's version.

The agents' testimony was largely consistent with each other and their version of the events is more believable than Defendant's version.  Defendant's testimony raises a number of questions about his credibility.  The testimony was internally inconsistent, contradicted by other evidence, and at times difficult to believe.

For example, on a critical matter, Defendant's testimony was inconsistent. Defendant initially testified that he was given the option to either turn his cell phone off, or leave it on and put it in a room across the hall where it might still be heard. (Tr. 81.)  But on cross-examination, Defendant testified that he was not given the option to put his phone in a room across the hall; he could either turn it off or give it to the agents.  (Tr. 108.)  If, as Defendant initially testified and both agents testified, he was given the option to leave the phone on in another room, it would have made much more sense for him to do so if he was in fact waiting on a call from a lawyer. Instead, Defendant chose to turn the phone off.  (Tr. 82.)  It was only on cross-examination that Defendant changed his account of events and said that he was not given the option to leave his phone across the hall.  (Tr. 108.)  The undersigned concludes, by a preponderance of the evidence, that Defendant turned the phone

17

off because he was not waiting on a call from a lawyer, and he never told the agents that he was.

In addition, although less significant, Defendant insisted that he called S.A. Lomonaco back on January 24, 2014. (Tr. 92, 94.)   Defendant's own exhibit, however, contradicts this statement.   The phone records admitted indicate that Defendant received a phone call that lasted three minutes from the Secret Service office at 9:43 a.m. on January 24, 2014.  (Doc. 86-4 at 3, Tr. 93–94.)  The phone records do not show any outgoing calls to a Secret Service office phone number.[12] (*See* Doc. 86-4, Tr. 94–96.)  Defendant explained that he did not call back the number from which S.A. Lomonaco had called him earlier that morning, but rather dialed a different number that S.A. Lomonaco had given him during the January 6 interview.   (Tr. 95–97.)   Defendant said that he walked around with the phone number in his wallet.  (Tr. 95.)  But S.A. Lomonaco testified that he did not recognize any of the other phone numbers listed in the exhibit as a phone number belonging to him.  (Tr. 135–36.)  Defendant also stated that S.A. Lomonaco had just testified in the hearing about the second phone call (Tr. 97), but S.A. Lomonaco did not do so.  (*See* Tr. 47–49.)  Although it does not appear particularly significant whether there was one call or two, this is an example of Defendant's testimony being contradicted, and S.A. Lomonaco's testimony being corroborated, by Defendant's

---

[12] The Secret Service Jacksonville field office phone number is 904-296-6660.  (Tr. 135.)

cell phone records.

Defendant also testified that he called his attorney, Vic Murray, immediately after ending his conversation with S.A. Lomonaco.  (Tr. 76.)  But the phone bill indicates that Defendant did not call Mr. Murray until approximately 20 minutes after his conversation with S.A. Lomonaco ended.[13]  (Doc. 86-4 at 3, Tr. 78.)   Again, although this may not be critical, it contradicts Defendant's testimony and tends to show that Defendant was not as alarmed by S.A. Lomonaco's phone call as he indicated.

Further, Defendant testified that one of Mr. Murray's assistants advised him to have no contact with the agents without Mr. Murray present.  (Tr. 80, 98.) Defendant failed to credibly explain why he then went to the interview anyway instead of simply driving to Mr. Murray's office and waiting for him, or contacting another criminal defense attorney.  His explanations, including that he did not think of it, or his alleged fear of getting immediately arrested if he veered off course from the Secret Service office, were not persuasive.

At one point during cross-examination, Defendant attempted to explain the second page of his written statement, where he wrote "I will pay back any money Chris Kirkland give to me" and "I admitted that I carry Items that was part or may not of [illegible] carry, I only profit [illegible] 1000 to 1200." (Doc. 86-3 at 3.)  Defendant testified that he was actually referring to money he made from Mr. Kirkland's roofing

---

[13] Vic Murray's phone number is 353-0001.  (Tr. 78.)

19

work. (Tr. 113.)  Defendant explained that Mr. Kirkland told him that if Defendant helped him on a roofing job, Mr. Kirkland would split the job with him.  (Tr. 114.) Defendant made somewhere between $800 to $1,000 doing the roofing work.  (Tr. 113.)  According to Defendant, the agents asked him if he was willing to give the money back, because he "made money off Mr. Kirkland" and Mr. Kirkland took money from the victims.  (Tr. 113.)   Defendant told the agents that he only made between $800 and $1,000, but they demanded that he write that he profited $1,000 to $1,200.  (Tr. 120.)

Both the content of this testimony and Defendant's demeanor while testifying were not believable.  It is unlikely that the agents would ask Defendant to give back money he made from a legal, legitimate roofing job simply because that money came from Mr. Kirkland.  It is equally unlikely that Defendant would actually believe he was required to give back such money.  Further, it does not make sense that the agents would insist that Defendant write that he profited about $200 more than he told them he did, as it does not seem the additional $200 would make any difference. Defendant's attempt to explain away this written statement was unbelievable and casts doubt on his overall credibility.

Defendant also stated that the agents told him he could not leave until he corrected his statement, even if it took "all day and all night."  (Tr. 84.)  However, the written statement Defendant provided does not fully admit guilt.  Defendant testified to as much on cross-examination.  (Tr. 117.)  Although it is possible that the agents

did initially tell Defendant he could not leave, but then finally gave up on getting the statement they wanted, it is more persuasive that they never told him that in the first place.

In addition, the undersigned finds it difficult to believe that the agents would go to the great lengths described by Defendant to get a statement from him and then perjure themselves to have the statement admitted.  It would appear that from the agents' standpoint, the charges against Defendant are not so serious, nor the alleged role of Defendant in the crime so important, that they would act in this manner.  It is also unlikely that S.A. Lomonaco would have threatened Defendant with arrest, and told him he did not need an attorney, on a phone call where anyone could be listening.

Moreover, Defendant's testimony regarding the stark contrast between the first and second interviews, while possible, seems less likely than two similar interviews. Apparently, nothing about the first interview caused Defendant enough concern to consult with an attorney.   S.A. Lomonaco's complete transformation from a professional agent during the first interview, to one willing to disregard fundamental constitutional rights during the second, does not seem likely.

Though Defendant's testimony is mostly corroborated by Mr. Brumfield's testimony, the undersigned still does not find Defendant's account of events credible. Based on his relationship with Defendant, Mr. Brumfield's testimony is not entirely credible as he may have a motive to protect Defendant.   He appears to be a

business associate and/or friend of Defendant.  As a 33-year-old full time student, he appears to be at least somewhat dependent on Defendant for economic opportunities.

Finally, in determining credibility, the undersigned has considered the questions courts typically suggest that juries consider.  *See Eleventh Circuit Pattern Jury Instructions* (Criminal Cases) (2010), Basic Instruction 5.  Of course, Defendant has a significant interest in the outcome of the Motion and the charge.[14]   Moreover, Defendant's demeanor was not persuasive and both agents' demeanor was.  For example, at times, Defendant presented as more of an advocate than a witness.  (*See, e.g.*, Tr. 83, 99, 100.)  Eventually, the undersigned had to remind Defendant to just answer the question.[15]  (Tr. 110.)   In contrast, both of the agents were straightforward in their testimony.

Thus, in the following analysis, the undersigned adopts the government's version of significant events, and recommends that the Court generally adopt the

---

[14] In his written statement, Defendant wrote: "I am will[ing] to do what ever it takes to make this right."  (Doc. 86-3 at 3.)  Also, in his first interview with S.A. Lomonaco, Defendant admitted that he lied to him about whether he drove Mr. Kirkland around.  (Tr. 70.)  At the second interview, Defendant stated that he was there to tell the truth this time.  (Tr. 54.)   Accepting S.A. Lomonaco's testimony as true, Defendant's piecemeal inconsistent statements show that Defendant was willing to lie to avoid charges and conviction.

[15] Defendant's own attorney had to remind him to just answer the question as well.  (Tr. 114.)

agents' testimony as its findings of fact.[16]   Furthermore, the undersigned recommends that the Court reject Defendant's version of the events, and Mr. Brumfield's testimony, but accept the authenticity and accuracy of Defendant's Exhibit 1, his cell phone bill (Doc. 86-4).

## B.   Defendant's *Miranda* Argument

Defendant argues that the oral and written statements at issue were obtained in violation of his right to counsel guaranteed by the Sixth and Fourteenth Amendments and his privilege against self-incrimination guaranteed by the Fifth and Fourteenth Amendments and *Miranda v. Arizona*, 384 U.S. 436 (1966).  (Doc. 58 at 1.)   "The 'initial step' in determining whether a person was in 'custody' under *Miranda* 'is to ascertain whether, in light of the objective circumstances of the interrogation' and the totality of all the circumstances, 'a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave.'" *Matcovich*, 522 F. App'x at 851.

In considering the totality of the circumstances, the undersigned finds that a reasonable man in Defendant's position would have felt free to leave at any time. Defendant drove himself to the Secret Service office.  (Tr. 49, 77, 91.)  Critically, he was unambiguously told that he was free to leave and would not be arrested that day.  (Tr. 12, 29, 53.)   "Courts may . . . consider whether a defendant was

---

[16] As previously noted, *see supra* note 5, the agents' estimate of the length of time of the interview may be incorrect, and the undersigned recommends that the Court not adopt this estimate.

unambiguously advised that he is free to leave and is not in custody.  This is a powerful factor that generally will lead to the conclusion that the defendant is not in custody absent a finding of restraints that are so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview." *Matcovich*, 522 F. App'x at 851.

Accepting the agents' testimony, very little, if anything, about the interview would suggest to a reasonable person that he or she was in custody.  Certainly, there is no indication of such extensive restraints as to overcome  S.A. Lomonaco's statement to Defendant that he was free to leave at any time.  The agents were wearing plain clothes, did not display firearms, and did not display other tactical gear.  (Tr. 11, 12, 16, 23, 49, 50, 54.)  Although the door to the interview room automatically locked when closed (Tr. 8.), Defendant could have asked the agents at any time to open it.  The agents did not prevent Defendant from leaving at any time, including at the end of the interview.  (Tr. 20.)  The agents limited Defendant's access to his cell phone, but he made no objection to this, and did not take advantage of the opportunity to leave it on.[17] (Tr. 13–14, 52.) Although the interview room was small (Tr. 8), the Secret Service office was not a neutral site, and there were leg iron shackles in the room (Tr. 136–37), these facts, when considered in

---

[17] S.A. Lomonaco testified that he requested that Defendant  turn his phone off or place it in another room for safety reasons.  (Tr. 71.)  S.A. Lomonaco has received training on the use of cell phones as improvised explosive devices and cell phones being modified to be used as firearms.  (Tr. 71.)  The undersigned finds this explanation to be credible.

light of all the facts and circumstances, did not transform the interview into a custodial interrogation.  Further, the credible evidence does not support Defendant's claim that he requested to speak with his attorney at any point during the interview.

In short, the government proved by a preponderance of the evidence that Defendant's statements were not obtained in violation of his privilege against self-incrimination or his right to counsel.

### C.   Defendant's Voluntariness Argument

Defendant also argues that his statements were not freely and voluntarily given and thus were obtained in violation of his Fifth Amendment rights.  (Doc. 58 at 1.)

Accepting the agents' testimony, there was little, if anything, coercive about the interview. The interview was not "exhaustingly long."[18]  *Thompson*, 422 F.3d at 1296.  Again, Defendant drove himself to the Secret Service field office.  (Tr. 49, 77, 91.)  The agents informed him that he could leave at any time and that he would not be arrested that day.  (Tr. 12, 29, 53.)  Neither agent displayed any weapons.  (Tr. 16, 54.)  The agents did not threaten or intimidate Defendant in any way.  (Tr. 38, 41.)  Though S.A. Andrews is a fairly large man (Tr. 27), Defendant is actually larger

---

[18] As stated above, *see supra* note 5, while the agents testified that the interview was about 45 minutes long, it may have lasted as long as one hour and 42 minutes.  Even assuming the interview, including Defendant's writing of his statement, lasted nearly that long, this amount of time is not so long as to suggest coercive police conduct, in light of all the circumstances, including Defendant's changing of his statements, which likely prolonged the interview.

than S.A. Andrews.  (Tr. 86.)  Defendant was not promised anything during the interview.[19]  (Tr. 13, 53.)

The agents did point out to Defendant that his written statement was inconsistent with the oral statements he had just made during the interview (Tr. 59–60, 68), but they did not force or threaten him into changing his written statement.  (Tr. 38.)  The circumstances already discussed in the previous section regarding custody, including the self-locking door, the limited cell phone access, the small room at the Secret Service office, and the nearby leg shackles, were not sufficiently coercive to make Defendant's statements involuntary.   Defendant remained calm and cooperative throughout the interview process.  (Tr. 10, 13, 16, 20, 30, 63.)  Defendant seems to be an intelligent individual, and he is a small business owner.  (Tr. 16, 52, 73.)   In his first interview with S.A. Lomonaco, Defendant was boisterous and raised his voice.  (Tr. 72.)  He does not seem to be susceptible to having his will easily overborne.

In short, the government proved by a preponderance of the evidence that Defendant's statements on January 24, 2014 were voluntary.

## RECOMMENDATION

Accordingly, the undersigned respectfully **RECOMMENDS** that the Court **DENY** the Motion (**Doc. 58**).

---

[19] The Motion states that Defendant was advised that the matter would be resolved in his favor if he incriminated himself.  (Doc. 58 at 2.)   At the hearing, however, Defendant did not testify that he was offered any type of immunity.

**DONE AND ENTERED** at Jacksonville, Florida, on October 3, 2014.

JOEL B. TOOMEY
United States Magistrate Judge

Copies to:

The Honorable Timothy J. Corrigan
United States District Judge

Counsel of Record